

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00021-CV

PITTSBURG STEEL, LLC, Appellant

V.

ARTHUR PALMER, Appellee

On Appeal from the 76th District Court
Camp County, Texas
Trial Court No. CV-21-03650

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

Arthur Palmer, an employee of Pittsburg Steel, LLC, suffered an injury at work on December 18, 2018. Less than three months later, he was terminated for an allegedly "pretextual reason in retaliation for initiating the filing of a workers' compensation claim." A Camp County jury agreed with Palmer, determined he was discharged because he had instituted "a workers' compensation claim in good faith," and awarded him $27,265.00 in lost wages. Adding prejudgment interest, the trial court entered a final judgment awarding Palmer a total of $30,920.77.

On appeal, Pittsburg Steel challenges the legal and factual sufficiency of the jury's findings. Because we determine that the jury's verdict was supported by legally and factually sufficient evidence, we affirm the trial court's judgment.

## I. Standard of Review

In resolving a legal sufficiency issue, an appellate court determines "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 582 (Tex. App.—Texarkana 2012, no pet.). "In looking at the evidence, we credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not." *Petrohawk Props., L.P. v. Jones*, 455 S.W.3d 753, 770 (Tex. App.— Texarkana 2015, pet. dism'd) (citing *City of Keller*, 168 S.W.3d at 827). As we have stated previously,

> The evidence is legally insufficient if (1) there is a complete absence of evidence
> of a vital fact; (2) the rules of law or of evidence bar the court from giving weight

to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence offered to prove a vital fact; or (4) the opposite of the vital fact is conclusively established by the evidence.

*Id.* (citing *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010)). "More than a scintilla of evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions." *Id.* (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

In evaluating factual sufficiency, we "consider . . . all of the evidence," including any evidence contrary to the verdict. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). The jury itself "is the sole judge" of witness credibility "and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). When a party without the burden of proof on an issue challenges the factual sufficiency of the evidence, the question on appeal is whether the evidence sufficiently supports the jury's conclusions. *Gooch v. Am. Sling Co.*, 902 S.W.2d 181, 184 (Tex. App.—Fort Worth 1995, no writ). As long as there is enough evidence before the jury that reasonable minds could differ on the meaning of the evidence or the inferences and conclusions to be drawn from the evidence, it will be deemed factually sufficient. We will only sustain a factual sufficiency challenge and "set aside the verdict 'if it is so contrary to the

3

overwhelming weight of the evidence as to be clearly wrong and unjust.'" *Petrohawk Props., L.P.*, 455 S.W.3d at 779 (quoting *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)).

## II.      Sufficient Evidence Supported the Retaliation Finding

Pittsburg Steel argues that the evidence was legally and factually insufficient to support the jury's finding that it discharged Palmer because he filed a workers' compensation claim in good faith. We disagree.

### A.      Relevant Law

"The Texas Labor Code states in pertinent part that '[a] person may not discharge or in any other manner discriminate against an employee because the employee has . . . filed a workers' compensation claim in good faith.'" *Kingsaire, Inc. v. Melendez*, 477 S.W.3d 309, 312 (Tex. 2015) (alterations in original) (quoting TEX. LAB. CODE ANN. § 451.001(1)). "An employer who violates this statute is subject to a retaliation claim, which constitutes 'an exception to the traditional doctrine of "employment at will" found in Texas law.'" *Id.* (quoting *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 453 (Tex. 1996)).

"To prove a violation of Section 451.001, it is not necessary to show that a workers' compensation claim was the sole motivation for the termination." *Echostar Satellite L.L.C. v. Aguilar*, 394 S.W.3d 276, 287 (Tex. App.—El Paso 2012, pet. denied) (citing *Cazarez*, 937 S.W.2d at 450). Rather, an employee must "prove a causal link between the filing of a workers' compensation claim and subsequent discharge." *Metal Indus., Inc. of Cal. v. Farley*, 33 S.W.3d 83, 86 (Tex. App.—Texarkana 2000, no pet.) (citing *Hogue v. Blue Bell Creameries, L.P.*, 922 S.W.2d 566, 569 (Tex. App.—Texarkana 1996, writ denied)). "The Texas Supreme Court has

4

established the standard of causation for this purpose: the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did." *Id.* (citing *Cazarez*, 937 S.W.2d at 450). "Thus, [Palmer] was required to prove that, but for h[is] filing of a workers' compensation claim, [Pittsburg Steel] would not have fired h[im] when it did." *Id.* As we previously stated,

> Circumstantial evidence that may show this causal link includes (1) knowledge of the compensation claim by those making the decision to terminate; (2) a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment of the injured employee in comparison to similarly situated employees; and (5) evidence that the stated reason for discharge was false.

*Id.* (citing *Cazarez*, 937 S.W.2d at 451). "[S]trong evidence showing the stated reason for discharge is false is alone a sufficient basis from which to infer a causal link between an employee's workers' compensation claim and subsequent discharge." *Id.* at 87; *see Aguilar*, 394 S.W.3d at 287; *City of Hidalgo v. Wisdom*, No. 13-00-203-CV, 2001 WL 1002181, at *4 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2001, no pet.) (not designated for publication).[1]

## B. The Evidence at Trial

Wes Baker, the founder and president of Pittsburg Steel, testified that Pittsburg Steel purchased workers' compensation insurance in 2014 or 2015 to cover its employees and that Palmer started working for Pittsburg Steel in 2016 in the "shear department." Baker said that Palmer reported being injured on the job on December 21, 2018.

---

[1]But "termination pursuant to the '[u]niform enforcement of a reasonable absence-control [policy] . . . does not constitute retaliatory discharge.'" *Melendez*, 477 S.W.3d at 312 (alterations in original) (quoting *Cazarez*, 937 S.W.2d at 451).

Palmer testified that he had no back problems before his work-related injury. When asked to describe how the injury occurred, Palmer said, "I was at the press brake and the forklift driver put my metal on the ground, a pallet, and I bent over and picked up probably about four or five sheets, . . . probably 30 pounds a piece, and when I raised up, my back popped." Palmer testified that the noise was followed by pain in his lower back that radiated down his left leg. Palmer notified a supervisor, Jason Heintz, who helped him walk to the company office.

Palmer met with Baker's wife, Tonya Baker, who was the vice president of Pittsburg Steel. On Tonya's instruction, Palmer visited the doctor, where an x-ray revealed a bulging disc. On December 21, Tonya submitted a report to the workers' compensation insurance carrier stating that Palmer "injured his back while . . . removing material from rack to table." The insurance carrier thanked Tonya for the submission and said that a claim professional would review the report. On December 26, Pittsburg Steel received a workers' compensation work status report stating that Palmer was allowed to return to work with restrictions, including no kneeling, bending, pushing, pulling, or twisting.

Baker said that it was Pittsburg Steel's "responsibility in leadership to teach all of the supervisors to accommodate [injured] employees" to ensure that an employee was not asked to perform tasks prohibited by their doctor after an injury. As a result, he said, company policy required supervisors to instruct any employee they saw performing tasks beyond their restrictions to stop performing the task. Accordingly, Baker testified that he was "very confident" that Palmer's supervisors, Heintz and Roger Smith, would have "done their best to accommodate [Palmer's] restrictions and keep him at work."

6

Palmer testified that he discussed his work restrictions with Heintz, was placed "on light duty," and was moved from the shear department to "the mobile home production department." Smith, the direct supervisor of the mobile home department, testified, "I feel like [the mobile home department is] just like the other departments, but to them, because I use lighter stuff and I don't do as much as the big heavy stuff, I guess they consider [it] a light duty department."

Palmer said Pittsburg Steel did not accommodate his restrictions. Palmer, who was six-foot three, explained that the parts he worked on came in "the standard barrels that you might burn trash and stuff in," that each barrel housed anywhere from 1,000 to 1,500 parts, and that after the barrel was half empty, he would have to "bend all the way over . . . to the bottom of the barrel" and "come back up" with "four or five parts at a time" "all day long." The parts would then be placed in a machine, where they would be cut to the customer's specifications. According to Palmer, the "[p]ain was excruciating." Palmer testified that there was "[n]o way possible" "to reach . . . the bottom of [the barrel] without bending or stooping," which aggravated his bulging disc.

Palmer testified that he often complained to Smith "that the bending over in[to] the barrels was killing [him]" and that he was not supposed to be bending. According to Palmer, Smith said he would inform Heintz, but his work "never changed" even though he complained "[u]ntil the day [he] was fired."

Smith remembered Palmer complaining "about grabbing parts out of the barrel." As a result, Smith said he put something under the barrel to make it lean or "started making sure they put the parts in a tub so [Palmer] could sit down and just reach for the parts," but Palmer testified

7

that parts were never brought to him in a tub and were always in a barrel. Heintz admitted that Palmer's work restrictions showed that he was not supposed to bend, stoop, kneel, or squat and that, contrary to doctors' orders, he was still assigned tasks that required him to do so while working in the mobile home department. Heintz knew that Palmer was still required to bend to "pull the parts out of a tub" or barrel.

While working in the mobile home department, Palmer was receiving medical treatment. Palmer's medical service provider sent bills to Pittsburg Steel for Palmer's medical treatment on January 10, February 7, and March 7, 2019. Palmer was fired on March 15, before a scheduled MRI. His written exit interview form reflected that Palmer was terminated, but the comment section was left blank.

After his termination, the workers' compensation carrier asked Tonya to explain the reason for Palmer's termination because it "might have exposure to pay him [temporary total disability] benefits . . . depending on the reason for termination from employment." Tonya responded that "[Palmer] was terminated . . . due to repeat failure to cut/punch parts right resulting in excess scrap loss." She continued, "The instance that resulted in termination was [the] continued production of 3,800 [wrong] parts." Tonya said she did not have documentation "for every instance of this issue," but attached a February 5, 2018, employee incident report, which was prior to Palmer's injury, stating that Palmer cut 750 pieces of metal too short while in the shear department.[2] The incident report said Palmer received three days' suspension and that a repeated mistake would "[r]esult in [d]ismissal." Tonya added,

---

[2]There was no written documentation of any mistake after Palmer's injury.

Additionally, we are aware from interaction in the community that Mr. Palmer has back issues prior to his employment with Pittsburg Steel. Those issues were not disclosed to us on employment but as we became aware of them[,] we were able to accommodate it with the type of work we assigned him. That is the primary reason he was moved from the shear department over to the Mobile Home parts area. (The parts there in the Mobile Home area typically are much lighter.)

Palmer admitted that he had miscut 750 pieces of metal well before his injury. He was aware of company documentation that stated, "The procedure for verification of hole patterns requires the operator to check every 10[]th part against his gauge to ensure that the part he is making fits to the gauge." However, he denied having any back problems before his injury.

In spite of Tonya's letter justifying Palmer's termination to the workers' compensation carrier, she testified at trial that she could not recall whether anyone from Pittsburg Steel had told her that Palmer had a bad back prior to his injury. Although Baker claimed they had moved Palmer "to the mobile home area some time well prior to his reported accident because of constant complaints he had about his back," Heintz, who supervised Palmer, testified that he was not aware that Palmer had a bad back before his on-the-job injury.

As for the alleged incident that occurred after Palmer's injury, Palmer admitted that he had messed up 3,000 parts over the course of three days, but that the incident had occurred in January 2019 and that he was assured he would not be fired. Palmer explained,

> When I messed up the parts, [Heintz] came, [Smith] knew, and [Heintz] looked at the machine and said that [Travis, Baker's son-in-law,] had welded the wrong part on the machine, that I would not be punished or fired for the parts. He told the other supervisor to come down, which is Roy Jennings, for me to show him the parts that I messed up so they could get rid of the parts[,] and I would not be punished.

9

According to Palmer, Heintz inspected the cutting machine and said Travis had welded the wrong part into the machine and that the incident was not his fault. Palmer said that the miscut parts were placed into a recycling bin, which he believed was an effort to hide the mistake from Baker.

Baker testified that the incident "occurred immediately with termination," which resulted in the lack of paperwork documenting the 3,000-part loss. Smith could not recall whether the loss happened in January or March 2019 "because [they] didn't write nothing up at the time," but he believed it occurred close to Palmer's termination. Heintz testified that he was not aware of the exact date that the 3,000 parts were allegedly miscut by Palmer over the course of three days, but said it was within the six months of Palmer's termination. He later said it was within two to three days of his termination. When asked whether Pittsburg Steel "would have internal documentation of what parts [Palmer had allegedly] messed up" in March 2019, Tonya said, "I would think so, yes," but no such documentation was ever produced.

According to Heintz, Smith supervised three or four people in the mobile home department and should have discovered the thousand parts that were allegedly miscut on the first day and the second thousand allegedly miscut on the second day. Heintz also said that Smith would have known about the miscut parts first, that concealing such a mistake would cause Smith to be disciplined, and that Smith was never disciplined for failing to supervise Palmer's alleged mistake. Palmer testified that neither Smith nor Heintz were disciplined in connection

with the incident. As a result, Palmer testified that he believed he was fired because of his work injury and the workers' compensation claim.[3]

Yet, when asked if Palmer's workers' compensation claim contributed to his termination, Baker testified that Pittsburg Steel "[was not] even aware that . . . it was still going on."[4] Baker also said he did not believe Heintz was aware that Palmer's claim "was still going on" at the time he was fired because Heintz would have gotten approval from Baker to terminate if he was aware of it. Tonya had told the workers' compensation carrier that she "did not realize [Palmer's] claim was still open" in the same email that she used to notify them of Palmer's termination, and Heintz also testified that he was unaware that the workers' compensation claim was still open.[5]

However, Tonya testified that Palmer had to report to Heintz if he had to miss work for any reason, that Heintz would have known of Palmer's March 7 visit to the doctor, and that such request for time off would have alerted Heintz that the workers' compensation claim was still open. Tonya also said that the March 2019 bill would have put someone on notice that Palmer's workers' compensation claim was still open, and Heintz and Smith both testified that they were aware of Palmer's light-duty restrictions when he was fired.

Palmer testified that Heintz knew when he missed work to go to doctor appointments, that he went to the doctor on March 7, that he gave Heintz his work restriction papers on his

---

[3]Palmer testified that, since his termination, he had applied for and received disability for his back.

[4]Heintz denied that Palmer's workers' compensation claim contributed to his termination.

[5]According to Tonya, no one at Pittsburg Steel treated Palmer differently because he had filed a workers' compensation claim.

11

return, and that Heintz knew his workers' compensation claim was pending when he was fired on March 15.

Baker confirmed that Palmer was able to perform the light duty at the time of his termination and that he was not fired for lack of performance. Smith said that "Palmer worked good" and that the "only issue [they] had was the . . . bad-punched parts." When asked to state, in his own words, what happened on the day he was fired, Palmer said,

> I came in to work one morning. I went to my station. . . . Smith said Jason Heintz wanted to talk to me. . . . [Heintz] said I have to terminate you. I said why. He said those parts. I said the parts you said you was going to get rid of. That wasn't my fault. He said yes. He said it's bigger than me. So I said you said you was going to get rid of them, I wasn't going to get fired. And I exited the building after he told me it was bigger than him.

## C.  Analysis

Pittsburg Steel argues that Palmer was fired after he miscut parts for the second time. It contends that, because Palmer was already warned that termination would result if he miscut parts again, his termination was not the result of retaliation. The jury rejected Pittsburg Steel's argument, and we conclude that the evidence supported the jury's findings.

Direct evidence of retaliation is rarely available. For this reason, it was not necessary for Palmer "to show that a workers' compensation claim was the sole motivation for the termination." *Aguilar*, 394 S.W.3d at 287. Instead, Palmer had to "prove a causal link between the filing of a workers' compensation claim and subsequent discharge." *Farley*, 33 S.W.3d at 86. Here, (1) knowledge of Palmer's workers' compensation claim by those making the termination decision, (2) a negative attitude toward his injured condition, (3) failure to adhere to company policy, (4) discriminatory treatment of Palmer in comparison to similarly situated

12

employees, and (5) evidence that the stated reason for discharge was false are all categories of "[c]ircumstantial evidence that may show this causal link." *Id.*

As for the first category, the jury heard Pittsburg Steel's argument that it was unaware of Palmer's pending workers' compensation claim but rejected it based on ample evidence indicating otherwise. Tonya stated in writing that she was unaware of the pending claim but admitted that the bills received by the company after Palmer's March 7 doctor's visit would have alerted Pittsburg Steel to the ongoing claim. Baker opined that Heintz must have also been unaware since he would have sought Baker's approval to fire someone with a pending claim but failed to do so before firing Palmer. Yet, both Palmer and Tonya testified that Heintz knew of the continuing workers' compensation claim because he had to approve Palmer's time off work, alerting him to the claim. Heintz and Smith also admitted that they were aware of Palmer's light duty restrictions when he was fired. From this evidence, the jury could have reasonably rejected Pittsburg Steel's argument that it did not know of Palmer's pending workers' compensation claim when he was fired on March 15, just eight days after his last doctor's visit.

Next, the second category requires analysis of whether Pittsburg Steel had a negative attitude toward Palmer's back injury. Baker claimed that Palmer was moved to the mobile home department because he complained of a bad back before his injury, but both Heintz and Smith testified that Palmer moved departments only after his on-the-job injury. Tonya wrote to the insurance carrier to claim that Palmer was known to have undisclosed back problems before his hire, but she testified that no one from Pittsburg Steel had informed her that Palmer had a bad back before the accident. Heintz also said that he was unaware of any preexisting back issues.

13

Although Heintz knew of Palmer's work restrictions, he admitted that Palmer was required to violate doctor orders when performing his tasks in the mobile home department. As a result, Palmer testified that, despite his complaints, Pittsburg Steel did not provide appropriate accommodations for his injury. From this evidence, a rational jury could conclude that Pittsburg Steel had a negative attitude toward Palmer's injured condition.

The third category requires analysis of whether Pittsburg Steel failed to adhere to company policy. Baker said that company policy required supervisors to instruct any employee they saw performing a task beyond their restrictions to stop performing the task. The evidence showed that this company policy was violated because (1) Smith remembered Palmer complaining about "grabbing parts out of the barrel," (2) Heintz admitted that Palmer performed tasks beyond his restrictions, and (3) Palmer testified that his work restrictions were not accommodated. Baker also testified that Heintz should have sought his approval before terminating an employee with a pending workers' compensation claim but failed to do so.[6] From this evidence, the jury could have concluded that Pittsburg Steel failed to adhere to company policy.

As for the fourth category, Pittsburg Steel argues that there was no evidence of discriminatory treatment of Palmer in comparison to similarly situated employees. Even so, Baker testified, "I believe if [Heintz] had known that [Palmer] was on work restrictions and that the injury was not completely behind him, [Heintz] would have brought that to my attention rather than move forward with the termination." Accordingly, because Heintz testified that he

[6]Also, although Tonya believed that the loss of 3,000 parts over the course of three days would have been documented, Pittsburg Steel produced no documentation.

knew of the ongoing restrictions, the jury could have found that Palmer was treated differently than similarly situated employees because Baker was not consulted before Heintz fired an injured employee.

Also, there was evidence that, while Palmer and Smith made the same mistake, only Palmer was disciplined. Although Smith was a supervisor, the incident could still inform the jury's conclusion on the ultimate issue. Palmer explained that Baker's son-in-law had misinstalled a part on the machine and that, as a result, he was expressly told that he would not be punished for miscutting 3,000 parts in January. Palmer said that the parts were placed in the recycling bin, which he believed was Heintz and Smith's effort to hide the incident from Baker. No paperwork resulted from the incident, and Palmer testified that neither Smith nor Heintz were disciplined in connection with it. Heintz said that Smith only supervised three or four people in the mobile home department and should have discovered the first thousand parts that were allegedly miscut on the first day and the second thousand parts allegedly miscut on the second day. Heintz also said that Smith would have known about the miscut parts first, that concealing such a mistake would cause Smith to be disciplined, but that Smith was never disciplined for failing to supervise Palmer's alleged mistake. Palmer believed that he was terminated for the incident months later because of his ongoing workers' compensation claim.

As for the fifth category, some courts have concluded that "strong evidence showing the stated reason for discharge is false is alone a sufficient basis from which to infer a causal link between an employee's workers' compensation claim and subsequent discharge." *Id.* at 87; *see Aguilar*, 394 S.W.3d at 287; *Wisdom*, 2001 WL 1002181, at \*4. Tonya's written correspondence

15

to the workers' compensation carrier stated that, in addition to the miscut parts, Palmer failed to disclose a preexisting back injury. As recited above, that statement was never verified. Palmer also testified that he was assured he would not be disciplined because of the 3,000 miscut parts in January, since the incident was not his fault. Due to (1) the lack of documentation for such a large loss, (2) Smith's testimony that he could not recall whether the loss happened in January or March 2019 "because [they] didn't write nothing up at the time," and (3) Heintz's testimony that he was not aware of the exact date that the 3,000 parts were allegedly miscut, the jury could have believed Palmer's version of events.

The evidence showed that Palmer suffered an injury at work, filed a workers' compensation claim in good faith, and was placed on doctor restrictions that were not completely followed despite Palmer's complaints. After receiving three medical bills and Palmer's work restriction notice following his March 7 visit, Pittsburg Steel fired Palmer before a scheduled MRI. The jury was free to weigh Palmer's credibility against the credibility of Pittsburg Steel's witnesses and to resolve the conflicting evidence. Viewing the evidence in the light most favorable to Palmer, we conclude that there was more than a scintilla of evidence to support the jury's findings of retaliation. Even when viewing the evidence in a neutral light, we find that the jury's verdict was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. As a result, we find that legally and factually sufficient evidence supported the jury's conclusion that Palmer was discharged because he had instituted a workers' compensation claim in good faith. Consequently, we overrule Pittsburg Steel's first point of error.

16

**III.    Sufficient Evidence Supported the Amount of Lost Wages Awarded**

In its second point of error, Pittsburg Steel challenges the amount of lost wages awarded. "The proper measure of lost wages damages for a violation of the Anti-Retaliation Statute is the amount the employee would have earned had []he not been discharged in violation of the statute." *Farley*, 33 S.W.3d at 88 (citing TEX. LAB. CODE ANN. § 451.002(a)); *see Hertz Equip. Rental Corp. v. Barousse*, 365 S.W.3d 46, 57 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ("The correct measure of damages for lost wages is the amount of money the employee would have earned had he not been terminated, less the sum he will earn after termination.").

Palmer's and Tonya's testimony showed that Palmer was paid $14.00 per hour and worked approximately forty-five hours per week. Palmer's testimony and his paycheck stubs also showed that any time over forty hours was compensated at the rate of $21.00 per hour. Palmer testified that, after his injury, he had applied to several places to obtain work and "was trying to get on anywhere." He worked for a trash service for three days but could not continue because of his back. As a result, Palmer was seeking forty-one weeks of lost wages from the time he was fired until he was placed on disability in January 2020, which he calculated to be $27,265.00, including overtime.[7]

On appeal, Pittsburg Steel argues (1) that Palmer was fully disabled, (2) that there were no jobs available to accommodate a fully disabled person, and (3) that, as a result, Palmer should not have been entitled to *any* lost wages "[a]fter he testified under oath in his deposition that there was no light duty job at Pittsburg he could have done." Yet, the testimony at trial showed

---

[7]Palmer clarified that he was not "trying to double-dip and get lost wages . . . and [his] disability."

17

that Palmer was on light duty when he was fired, was not fired because he was physically unable perform his job, and could have continued his employment with the proper accommodations recommended by his doctors. The evidence also showed that Palmer did not apply for disability until January 2020.[8]

Next, Pittsburg Steel complains that the evidence to support lost wages was factually insufficient because "Palmer's inconsistent and self-serving testimony is not enough." Yet, Tonya testified that Palmer made $14.00 per hour and worked forty-five hours a week. This showed that Palmer received $560.00 per week for his regular work week. Palmer's paycheck stubs, in addition to his testimony, showed that he received $21.00 for overtime, which amounted to $105.00 per week. This figure, multiplied by the forty-one weeks, equaled the $27,265.00 sought. Also, Palmer introduced his paycheck stubs, which showed that he had made $4,914.00 for regular earnings and $813.75 in overtime from January 2, 2019, to March 2, 2019. Palmer's average weekly sum from those two months of work, $715.96, multiplied by the forty-one weeks he was seeking, was above what he had asked for.

We find the evidence legally and factually sufficient to support the amount of lost wages awarded. As a result, we overrule Pittsburg Steel's last point of error.

---

[8]Pittsburg Steel generally cites to Section 18.091(a) of the Texas Civil Practice and Remedies Code, but makes no argument related to that section. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 18.091(a).

18

## IV.    Conclusion

We affirm the trial court's judgment.

Scott E. Stevens<br>
Chief Justice

Date Submitted:     November 13, 2023
Date Decided:       December 11, 2023